Filed 4/15/16  P. v. Romero CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAIME DEMECIO ROMERO,<br><br>        Defendant and Appellant. | A142774<br><br>(San Mateo County<br>Super. Ct. No. SC079701A) |

## INTRODUCTION

A San Mateo County jury convicted defendant Jaime Romero of assault with a semiautomatic rifle and other crimes, rejecting his claim of self-defense.  On appeal, defendant contends the evidence adduced at trial was insufficient to disprove self-defense.  He also argues his attorney was ineffective for requesting CALCRIM No. 3472, entitled "Right to Self-Defense:  May Not Be Contrived."  We affirm.

## STATEMENT OF THE CASE

Defendant Romero was charged by information in San Mateo County with assaulting Nicolas Villa-Madriz with a semiautomatic rifle.  (Pen. Code,[1] § 245, subd. (b).) The information alleged defendant personally used a firearm and inflicted great bodily injury, and committed the assault for the benefit of a criminal street gang. (§§ 1203.06, subd. (a), 12022.5, subd. (a), 1192.7, subd. (c)(8), 186, subd. (b)(1).)

---

[1]   Unless otherwise indicated, all further statutory references are to the Penal Code.

Defendant was also charged with resisting arrest while causing great bodily injury (§ 148.10, subd. (a)), interfering with a police officer in the performance of his duties (§ 69), being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and possessing an illegal firearm (§ 29900, subd. (a).) The information also alleged defendant had previously suffered prior serious felony convictions for carjacking and robbery. (§§ 667, subd. (a), 1170.12, subd. (c)(2).)

The jury convicted defendant on all counts and found true the personal use of a firearm allegation. It found not true the gang-benefit allegation. Following a bifurcated bench trial, the court found true all the allegations relating to defendant's prior felony conviction. Defendant was sentenced to 17 years four months in state prison. Defendant timely appeals.

## STATEMENT OF THE FACTS[2]

On August 28, 2013, after an altercation, defendant shot Nicolas Villa-Madriz in the left hip and buttock with a fully loaded semiautomatic .25-caliber Beretta firearm. The shooting occurred in the 1300 block of Willow Road in Menlo Park. Disputed at trial was whether defendant shot Nicolas in self-defense after Nicolas threatened him with a baseball bat.

### The Prosecution's Case

The altercation on August 28, 2013, was not the first confrontation between Nicolas and defendant. On an earlier occasion, Nicolas was walking with his mother to his brother Jorge's home when defendant screamed "little bitch" at Nicolas and pushed him. Nicolas ignored defendant and walked faster.

---

[2] Since defendant's appeal challenges his assault conviction only, and the gang allegation was found not true, we summarize only those facts about the defendant's gang affiliation that relate to a possible motive for the assault, and omit facts relating solely to the other counts.

Another time, defendant and a companion (later identified as defendant's cousin Erik) followed Nicolas as he walked from Jorge's apartment (where Nicolas was staying) to his mother's truck on his way to work. The pair commented on the color of Nicolas's clothing—blue jeans and blue Wal-Mart shirt—and called him a "little bitch." Erik grabbed Nicolas by the shirt and said, "I don't like that color . . . I don't like it and these are my apartments." Defendant was standing a short distance behind Erik when he spoke these words. During the two months Nicolas stayed with his brother in 2013, he saw defendant more than 10 times at the apartment complex with the same companion and they always called him "little bitch."

### Nicolas Villa's Account of the Altercation

On August 28, 2013, at 6:00 p.m., Nicolas was going to work, wearing his blue Wal-Mart shirt. His brother Antonio was going to meet him and give him a ride. Defendant and Erik walked towards him from a courtyard between two apartment buildings, calling him "bitch" and other names. Nicolas avoided them by walking down to the middle of the street. When Antonio arrived in his truck, Nicolas told Antonio he was going to talk to the pair to "see what their problem was." When confronted by Erik three weeks earlier, Nicolas said he was just going to work and did not want problems. At the time, Erik seemed to understand and walked away.

While Nicolas and Erik talked, defendant stood about 10 feet away. Defendant called Nicolas a "little bitch" and said he wanted to fight. Then, defendant approached Nicolas and punched him in the face, hitting him several more times. Erik joined in. Nicolas ran towards the back of Antonio's truck, followed by defendant and Erik, who continued to hit him in the face. Nicolas fell; defendant and Erik kicked him as he tried to cover his face. The assault lasted about three minutes. When Nicolas opened his eyes again, defendant and Erik were hitting Antonio. Nicolas got up and pulled Antonio away. As Nicolas and Antonio retreated, defendant pulled a gun out of his backpack and pointed it at them.

3

Nicolas went to Jorge's apartment. His face was "all bloody"; his mouth was "busted" and his teeth were loose; his head was "full of bumps" and his "back was hurting." Nicolas told his sister-in-law to call the police about the beating because "they had to get punishment for it." He also told her the men had a gun.

Nicolas, his brothers Jorge and Dagoberto, and his sister-in-law, Elizabeth Gonzales (Gonzales), walked outside to the front of the apartments. At some point, Antonio joined them. Defendant stood in the courtyard between the two apartment buildings and yelled at Nicolas. Defendant was with a woman Nicolas believed was defendant's girlfriend or wife. When Gonzales walked toward defendant to talk to him, the woman stepped between them. Gonzales said the police were coming. Screaming, defendant ran inside the building and emerged with a backpack. Defendant then ran towards a nearby gas station, and Nicolas followed, to prevent defendant from getting away before the police arrived. Dagoberto followed by a short distance.

Nicolas told defendant and Erik not to leave because the police were coming. Defendant called Nicolas a little bitch and said he had already beaten him up. Defendant and Erik then "took off running" behind a building. Nicolas followed, but he was far from them. As he rounded the corner, Nicolas saw defendant was already pointing a gun at him. Nicolas turned to run away as defendant shot him in the back of the leg. Nicolas thought defendant shot at him more than once. After he was shot, Nicolas walked back down the alleyway toward the front of the apartment complex while defendant came out through the other side of the driveway area waving the gun. Nicolas was later taken to the hospital.

Nicolas was questioned by a police officer later than evening after being released from the hospital. The officer asked him "over and over again" about a bat, but Nicolas maintained he had no memory of one. "I kept saying I didn't remember, but he then kept insisting. So I was, like, my nephew plays baseball and he . . . keeps his baseball bat

4

right outside his door on his front porch so it must have been that bat." Nicolas's nephew was six years old, and his bat was a 25-inch Louisville Slugger.

At trial, Nicolas maintained he did not actually remember getting a bat, but he admitted that if he did so, he must have gotten it from outside the door of the apartment. However, on cross-examination he admitted telling the police he got a bat out of Antonio's truck during the initial confrontation.

A week before he testified, Nicolas walked through the area of the shooting with the prosecutor and several detectives and identified the respective locations where he and defendant were standing when defendant shot him. Photographs of the locations were introduced at trial. The distance between defendant and Nicolas at the time Nicolas was shot measured 44 feet.

### Villa Family Members' Accounts of the Altercation

Antonio Villa-Madriz corroborated Nicolas's account of the initial confrontation. Nicolas did not have anything in his hands when defendant and Erik set upon him. Antonio went to his brother's aid and was himself set upon by defendant and Erik. Nicolas pushed defendant away from Antonio, who then got back in his truck. Nicolas ran away; Antonio did not see where Nicolas went.

A short time later, Antonio heard people yelling, "Don't let them leave," from the vicinity of the apartments. He drove toward the gas station at one end of the apartment complex. He saw Nicolas and Dagoberto walking towards the gas station. He also saw defendant standing in front of the apartment complex talking on the phone; he was saying, "Come pick me up." Then defendant started walking towards the back of the complex.

As Antonio was driving, he heard defendant tell Nicolas, "Come back here," or "Let's go to the back. Let's go handle this to the back." Antonio saw Nicolas follow defendant into the back of the complex. Antonio made a U-turn and parked in front of another apartment complex. A short time later, Antonio heard gunshots. Antonio got out

5

of his truck, found his brother, and asked him where he was shot. Then Antonio left the scene because he was afraid he, too, would be shot. He drove to his girlfriend's house. On his way there, he was involved in a collision with a gray Jaguar.

Antonio maintained at trial he knew nothing about a baseball bat. He recalled the police asked about a baseball bat, but he did not remember seeing a bat. However, police found a duffel bag and baseball bat inside the bed of Antonio's truck later that evening.

Elizabeth Gonzales is married to Nicolas's brother Jorge. She corroborated Nicolas's account of the events in her apartment and outside in the courtyard. When Gonzales attempted to talk to defendant in the courtyard, defendant's girlfriend stepped between them and warned Gonzales, with clenched fists, not to get any closer. Defendant ran inside the apartment building when Gonzales said she was going to call the police. Nicolas walked to Antonio's truck and sat in it.

Defendant's girlfriend, Jadymaire Guzman, drove away in a gray car. Defendant returned to the courtyard carrying a backpack and ran toward the gas station. Nicolas ran after defendant, followed by Jorge and Dagoberto. Nicolas did not have anything in his hands as he followed defendant. A few minutes later, Gonzales heard one gunshot, then saw defendant running in her direction with a gun in his hand. She did not see anyone with a bat at any point in time.

Dagoberto Madera, also a brother of defendant, was at Elizabeth's and Jorge's apartment when Nicolas arrived all bloodied. Nicolas, Jorge, Elizabeth and Dagoberto went outside. As Dagoberto exited the apartment, he saw Nicolas with a bat, but he did not see how Nicolas got it. Dagoberto took the bat away from Nicolas and put it in Antonio's truck, which was parked in front of the apartments, with Antonio sitting in it. They went to stand near the truck, and Nicolas was leaning against it. Nicolas did not have a bat at any time after Dagoberto put it in the truck. Nicolas never withdrew the bat from the truck.

Defendant and Erik came outside and started laughing at Nicolas.  Because Nicolas walked towards them, Dagoberto assumed Nicolas wanted to fight them.  Erik threatened to hit Nicolas with a beer can.  Defendant ran into an apartment building and came back out.  Dagoberto and Nicolas chased defendant when he ran through a courtyard of the apartment buildings.  Nicolas did not have anything in his hands at that time.  Nor did Nicolas have anything in his hands as he walked around the corner of the building into a walkway between the building and the gas station.  None of the brothers followed Nicolas into the walkway.  Nicolas was alone.  Dagoberto heard a shot, and a short time later Nicolas walked out of the alley saying he had been shot.  Then defendant ran out of the alley pointing a gun at everyone.

Jorge Villa was about to take a shower when he heard his wife, Elizabeth Gonzales, and his brother Dagoberto yell that Nicolas had been in a fight.  He got dressed and went outside.  He saw a bat "flying towards the grass in front of the courtyard" of the apartment complex, but he did not see who threw it.  The bat hit no one.  He never saw Nicolas or Dagoberto with a bat, nor did he see Dagoberto take a bat from Nicolas.

According to Jorge, defendant and Nicolas were standing outside the apartment complexes yelling at each other.  His wife, Elizabeth Gonzales, tried to calm things down, but a woman stepped between Gonzales and defendant.  The woman had her arms outstretched and screamed at Gonzales to leave defendant alone.  Defendant and Erik were standing behind the woman, and when Gonzales said she was calling the police, defendant ran into the apartment building.  Defendant came out, then went back in a second time.  When he came back out, he had a backpack.

While Elizabeth Gonzales was on the phone with the 911 operator, defendant and Erik ran into an alley between the two apartment complexes.  Nicolas, Dagoberto, and Jorge followed them, intent on preventing them from leaving before the police arrived.  Nicolas did not have a bat.  He followed defendant into the alley, telling him to wait for

7

the police. Jorge and Dagoberto did not go into the alley but turned and went back towards the area of Jorge's apartment.

When he reached a carport area, Jorge saw defendant pull the gun and heard a shot. Jorge and Dagoberto then changed directions, went back to the corner, and waited for Nicolas to emerge from the alley. Nicolas came out screaming, "I got shot," and lay down on the ground. Dagoberto did not stay in that area but walked away. He then saw defendant running and waving the gun in front of his body. Defendant pointed the weapon at Jorge. Later, Jorge saw defendant throw the gun into some bushes as the police arrived.

Jorge also testified about two prior confrontations he had with defendant. In September 2012 defendant screamed at him, "MNM Hoods. MNM Hoods. This is my block." Jorge told defendant he was not a gang member. On another occasion, when Jorge was wearing his blue work shirt, defendant grabbed Jorge's shoulder and said, "If you ain't a scrap, take off your fucking shirt."

### *Defendant's Girlfriend's Account*

Jadymaire Guzman, defendant's girlfriend, testified for the prosecution. On August 28, 2013, she arrived at her grandmother's apartment in the Willow Road apartment complex with defendant and her five-year-old daughter in her car between 5:30 p.m. and 6:00 p.m. Defendant got out of the car and went somewhere; his mother's apartment was nearby. She left her grandmother's apartment at 6:30 p.m. Just before she left, she called defendant a couple of times but did not reach him; he was supposed to go with her to drop off her daughter.

On cross-examination, Guzman testified for the first time she went outside and found defendant in front of his house; he was beat up. Some other men were near, but she was not paying attention to them. Guzman eventually admitted she positioned herself between defendant and a woman who was yelling at him. There were men behind her, and they were angry. She was afraid for defendant's safety. One of the men was

8

screaming at defendant. She told defendant, "Let's go. Let's leave." She went to her car, but defendant did not leave with her. She was going to meet him up the road.

She started to drive, but her path was blocked by people in the street. A few guys jumped out of the crowd and started to run. "[T]hey had blood on them and one didn't have a shirt on and another one was carrying a bat." It was a metal bat.

The man with no shirt said to her, "What? Are you going to run me over, too?" Then he broke off the passenger side mirror of her car with his hands. After that, a white truck sideswiped her car on the left side. In her rearview mirror, Guzman saw the white truck stop and the men who had hit her mirror get into the truck. "[T]hey were carrying a bat." One of the men dropped the bat, picked it up, and got into the white truck on the driver's side with it. The man running with the bat was the shirtless man. She did not see the person with the bat do anything with the bat except drop it. She never saw the man with the bat swing it at anyone.

After that, Guzman "took off." She did not hear gunshots. The men who swarmed her car were the same ones she saw earlier. Guzman drove to the police station to report the hit and run. She did not tell the police about the confrontation in the courtyard. She also left it out when the prosecutor first questioned her about what she did after she left her grandmother's house.

### The Defense Case

#### Independent Witness Account

Nicolas Ibarra (Ibarra) was driving through the gas station in his truck when he saw a "scuffle" between four or five people, including defendant and a man who was shirtless and had a bloody mouth. Although parked cars partially obstructed his view, he saw the shirtless man move to the white truck, grab a bat, and run back to the scuffle with it. He identified the shirtless man as Nicolas. Nicolas came within 15 feet of defendant with the bat. He did not swing it but held it up. Defendant ran towards the gas station. Nicolas went towards the apartment complex.

9

Later, Ibarra saw Nicolas and his brothers standing on the sidewalk near the entryway to a courtyard before they started running. At that time, Ibarra did not see Nicolas or anyone else with a bat. Elizabeth Gonzales came out screaming. Ibarra went back inside his apartment.

At some point after that, Ibarra saw defendant running; it looked like he was chasing a pair of the Villa brothers, but he could not tell which ones. Ibarra did not see defendant with a gun.

### *Defendant's Account*

Defendant testified in his own behalf. His mother, Erik's mother, and Jadymaire's grandmother all live in the apartment buildings in the 1300 block of Willow. On August 28, he and Erik were standing on the sidewalk in front of the apartment building in which Erik's mother lives when a white truck with two occupants abruptly stopped in front of them. Defendant was apprehensive because friends of his had been killed in drive-by shootings. The person defendant later learned was named Nicolas got out of the passenger side of the truck wearing a blue shirt over a black long-sleeved T-shirt. Nicolas walked toward defendant asking, "What you guys looking at? What's your problem?" Defendant responded, "We can fight," but not where they were; he suggested they "take it to the back," meaning the parking lot.

Nicolas ignored the comment and approached defendant with his fists up. Defendant put down his backpack and they "squared off." According to defendant, Nicolas threw the first punch but missed. Defendant then hit Nicolas in the mouth with a "one-two" punch, knocking him down. The other person in the truck, whom he later learned was Nicolas's brother Antonio, got out of the truck and ran towards defendant and Erik. Defendant and Antonio began to fight.

Nicolas grabbed a bat from the back of the truck and came towards him. Defendant drew a gun from his backpack and "flashed" it at Nicolas. Nicolas held the bat up as if he were about to hit a pitched baseball, but he did not swing the bat. After

10

Nicolas saw defendant's gun, "he didn't come at me no more with the bat." Nicolas withdrew and retreated towards the apartments. Defendant did not see where Antonio went.

Defendant and Erik returned to the rear courtyard between the apartment complexes where their mothers lived. Defendant called Jadymaire to come pick him up. While he was on the phone, Nicolas and Elizabeth Gonzales walked into the courtyard. Nicolas (now shirtless) was swinging a bat out to his side, pointing down. Two men who looked related to Nicolas (Dagoberto and Jorge), who were also there, were not acting aggressively. Elizabeth Gonzales seemed more worried than angry and asked, "Why [are] you guys . . . fighting?" Nicolas was behind her. Jadymaire arrived, but just went around them to talk to him. She asked defendant to leave with her. Defendant agreed to meet her at the gas station down the street.

When Jadymaire left, defendant ran around the corner toward the gas station chased by Nicolas. Defendant heard footsteps running after him and "looked back and . . . seen him running towards me. But by the time I got to the parking lot, I looked back; he wasn't there no more."

From an alley or walkway between buildings where defendant tried to hide, he could see the white pickup truck "driving crazy" and Nicolas, still shirtless, getting out of the truck holding a bat. Nicolas came towards him with the bat, while a woman who attempted to stop the fight, and Dagoberto and Jorge, were running towards him. Defendant moved further back into the alley and took his gun out of his backpack. Defendant believed Nicolas "really wanted to hurt [him]" and he felt "scared" and "outnumbered."

When defendant looked back again, Nicolas, still holding the bat, "just popped out of nowhere." Defendant "panicked," turned around, and shot Nicolas. "[B]y the time I looked back, I had the gun in my hand. And then I just pulled the trigger so it happened so fast." Although he told police he fired into the air and aimed at a wall, defendant

11

testified that, in fact, he "wasn't aiming" except to fire in Nicolas's direction. Defendant fired one shot. He testified he shot Nicolas because he "wasn't going to let [a] person hit me with a bat." When defendant saw Nicolas in the alley, he had stopped and positioned the bat in a baseball stance. Defendant estimated Nicolas was about eight feet away when he fired the gun. Defendant admitted Nicolas could not have hit him with the bat without coming closer.

Defendant admitted prior convictions for carjacking, robbery, and possession of stolen property. He also admitted lying to the police at the beginning.

Defendant's backpack and a loaded Beretta .25-caliber semiautomatic handgun were found at the scene. A .25-millimeter shell casing was recovered from the rear parking lot of 1385 Willow Road.

### Defendant's Gang Affiliation

Menlo Park Police Detective Aaron Dixon testified as an expert on gangs and gang-related activities in San Mateo County. He testified mainly about two rival Hispanic gangs, the Norteños and the Sureños, which he described as enemies "at war." In Menlo Park, MNM (Menlo 'n' Midtown) is a subset of the Norteños gang. There are about 150 documented Norteño gang members in Menlo Park. The 1300 block of Willow Avenue in Menlo Park is in Norteño gang territory, with gang markings etched on the trees around the apartments.

Defendant is an admitted Norteño affiliate. On his elbow, defendant sports a circle scar with one dot in the middle, which is a symbol very specific to the Menlo Park subset of the Norteños. Nicolas Villa-Madriz is an admitted Sureño affiliate.

## DISCUSSION

### Substantial Evidence Supports Defendant's Assault Conviction.

Defendant argues the evidence is insufficient to support his conviction for assault because "[t]he prosecution's own evidence raised a reasonable doubt on the issue of self-defense." Defendant acknowledges the substantial evidence rule governs his argument.

12

Under that rule, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)  "An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)  An appellate court does not reweigh the evidence, reassess witness credibility or resolve factual questions.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

It is true that, *at trial*, due process places "the burden of persuasion . . . on the People to show the nonexistence" of a defense that negates an element of crime "beyond a reasonable doubt." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570.)  "Self-defense negates culpability for assaultive crimes, whether or not the assault results in death.  [Citations.]  In either event self-defense goes directly to guilt or innocence. [Citations.]  On matters directly going to guilt or innocence, the burden of persuasion is on the state." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 340–341.)

The *Adrian* opinion involved the propriety of refusing to give a pinpoint instruction on the People's burden of persuasion with respect to self-defense in a non-homicide assault case.  (*People v. Adrian*, *supra,* 135 Cal.App.3d 335.)  It did not address the sufficiency of the evidence on appeal, and is not authority for the proposition we understand defendant to be making; namely, that to successfully challenge the sufficiency of the evidence *on appeal,* he need only show a rational jury *could have found* from the

prosecution's evidence that he acted in self-defense. We reject that proposition, for the following reasons.

As this case demonstrates, the ultimate question whether a defendant did or did not act in self-defense can turn on myriad factual issues, which are normally resolved by the jury. For example, these may include whether the circumstances would cause a reasonable person to perceive the necessity of self-defense, whether the defendant actually acted in defense of himself, and whether the force he used was excessive. (See *People v. Clark* (1982) 130 Cal.App.3d 371, 379, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) In a given case, it may even include whether the defense was contrived. As noted above, the substantial evidence rule prohibits us from reassessing the credibility of the witnesses or resolving factual disputes.

In order for us to find the evidence adduced at trial is insufficient to sustain the People's burden of persuading the jury defendant did not act in self-defense, "it must appear from the evidence that no reasonable trier of fact could have found otherwise beyond a reasonable doubt." (*People v. Clark, supra,* 130 Cal.App.3d at p. 377, citing *People v. Johnson, supra,* 26 Cal.3d at p. 576.) "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine. [Citation.] Where the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, then the issue is a question of fact for the trier of fact." (*People v. Clark,* at p. 379.)

Here, the jury was correctly instructed, "You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." Also, "[t]he testimony of only one witness can prove any fact. Before you

14

conclude that the testimony of one witness proved a fact, you should carefully review all the evidence."

Here, the evidence supportive of self-defense was far from uncontroverted, and reasonable persons could differ on whether defendant's resort to force was justified, or whether the force he used was excessive under the circumstances. The prosecutor presented substantial evidence which, if believed, established Nicolas was unarmed and did not confront defendant with a bat immediately prior to being shot. First, Nicolas did not testify to having a bat, and stated he did not remember having one. Antonio testified he knew nothing about a bat, and did not remember seeing one. Elizabeth Gonzales testified she did not see Nicolas with a bat at any point in time. Dagoberto testified he saw Nicolas with a bat when he exited Jorge's apartment, but he took it away from Nicolas and put it in the truck. Nicolas did not have a bat at any time after that. Jorge saw a bat flying through the air when he exited his apartment, but he did not see who threw it and it did not hit anyone. When Nicolas followed defendant into the alley, Nicolas did not have a bat. Even Ibarra, the independent witness called by the defense, did not put a bat in Nicolas's hands at the critical juncture, although he saw Nicolas with a bat during the initial fight.

To be sure, in this mishmash of individual accounts, there was testimony from some prosecution witnesses which, if believed, could support an inference that Nicolas had a bat during the second confrontation. For example, Nicolas admitted to police he got a bat out of Antonio's truck during the initial confrontation. He also admitted telling the police about his nephew's bat, which was located "right outside his door on his front porch," although he denied any memory of a bat. In addition, in Antonio's statement to police—although not in his testimony at trial—Antonio admitted there was probably a bat in his truck, although he did not know how it got there.[3] He also admitted to police he

---

[3]   Antonio's statement to police was admitted into evidence.

15

saw Nicolas with a bat, but "[h]e didn't actually hit 'em. . . . [H]e never actually got to them." The use of the plural "them" suggests he was referring to the initial fight between him, Nicolas, defendant, and Erik, but it is not clear when he saw Nicolas with a bat. Asked if "[t]his is when you drove off, . . . when your older brother [Nicolas] told you to leave," Antonio said "No."[4] Jorge testified he saw a bat fly through the air, apparently before the start of the second confrontation. Dagoberto testified he saw Nicolas with a bat as he exited his brother Jorge's apartment, but he took it away from Nicolas and put it in Antonio's truck. Guzman testified she saw the shirtless man (Nicolas) drop a bat after the second confrontation in the courtyard. She never saw the man with the bat swing at anyone. The man with the bat got into a truck on the driver's side. However, determinations about the relative credibility of the witnesses' testimony and prior statements was for the jury to decide. From the appellate perspective, substantial evidence was presented by the prosecution that Nicolas did not have a bat when he was shot.

Similarly, the prosecutor presented substantial evidence in the form of testimony, maps and photographs which, if believed, established that Nicolas was too far away from defendant to constitute a threat to him, even if he did have a bat. Nicolas's testimony about his position at the scene relative to defendant established that Nicolas was 44 feet away from defendant when defendant shot him. Although defendant estimated Nicolas was only eight feet away when he fired his gun, we note even he testified Nicolas was not

---

[4]   Antonio went on to describe a scenario in which he pulled up in his truck, saw Nicolas run "towards the little back thing over here, on the side. And then I . . . went . . . this side so . . .when he comes back out we can fucking take off. . . . But I heard gun shots and . . . I see my brother [Dagoberto] in front and like 'just take off, just take off.' [¶] . . . [¶] . . . Like man like, he was figur[ing] I was get[ting] shot or something. So . . . then this truck bump into me in the back but I don't know who was in there . . . and I just took off."

16

swinging the bat when he fired the gun and was, in any event, too far away to hit him with it when he shot Nicolas.

In short, the prosecution presented substantial evidence from which a rational jury could reasonably find that (1) defendant shot an unarmed man; or (2) Nicolas had a bat, but a reasonable accused would not have believed he was in imminent danger; or (3) defendant's use of a gun was excessive force under either scenario; or (4) defendant contrived to create a situation to shoot Nicolas, whether or not he had a bat, out of some preconceived animus or motive, perhaps related to his gang affiliations. Each of these alternative findings presented questions of fact for the jury to decide, and as an appellate court we cannot pick and choose between the possible factual scenarios a rational jury could have accepted or rejected, in whole or in part. That the record also includes some evidence from which a rational jury could have found otherwise does not establish that defendant acted in self-defense as a matter of law. Therefore, defendant's substantial evidence claim fails. The evidence adduced at trial was sufficient to support his conviction for assault with a semiautomatic firearm. Furthermore, we find the jury was correctly instructed on the legal principles needed to resolve this case.

### The Court Did Not Err in Giving CALCRIM No. 3472 on These Facts, and Defendant Cannot Establish Defense Counsel Was Ineffective for Requesting It.

Defense counsel requested, and the trial court gave, CALCRIM No. 3472, entitled "Right to Self-Defense May Not Be Contrived." It provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."[5] In *People v. Enraca* (2012) 53 Cal.4th 735, 761, our Supreme

---

[5] As delivered, CALCRIM No. 3472 was immediately preceded by the following modification to CALCRIM No. 3470: "If you find that Nicolas Villa-Madriz threatened the defendant with an act, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. Someone who has been threatened by a person in the past, is . . . justified in acting more quickly or taking greater self-defense measures against that person. A defendant is not required to retreat. He is entitled to stand his ground and defend himself; and if necessary, to pursue an assailant until the

17

Court approved CALJIC No. 5.55 embodying a similar principle.[6] (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381; *Fraguglia v. Sala* (1936) 17 Cal.App.2d 738, 743–744; *People v. Hinshaw* (1924) 194 Cal. 1, 26.)

Defense counsel also requested CALCRIM No. 3471, "Right to Self-Defense: Mutual Combat or Initial Aggressor." However, that instruction was not given, and defendant makes no argument on appeal that it should have been given.[7]

---

danger of death or bodily injury has passed. This is so, even if safety could have been achieved by retreating. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant . . . not guilty of assault with a semiautomatic firearm as charged in Count 1." CALCRIM No. 3472 was immediately followed by CALCRIM No. 3474, which provides: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

[6] CALJIC No. 5.55 provides: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

[7] CALCRIM No. 3471 provides: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:

"1. (He/She) actually and in good faith tried to stop fighting;

"[AND]

"2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)

"*<Give element 3 in cases of mutual combat.>*

"[AND

"3. (He/She) gave (his/her) opponent a chance to stop fighting.]

"If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

"[However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not

18

On appeal, defendant argues: "The instruction erroneously directed the jury to conclude that Romero had no right of self-defense even if Romero contrived to provoke a confrontation using only nondeadly force against [Nicolas]. The instruction made no allowance for an intent to use only nondeadly force in response to an adversary's sudden escalation to deadly violence." (See *People v. Ramirez* (2015) 233 Cal.App.4th 940, 945.) Therefore, he argues, defense counsel rendered ineffective assistance of counsel by requesting an instruction that "essentially directed the jury to reject Romero's self-defense claim." We disagree.

In the first place, the instruction did not *direct* the jury to find anything. In fact, the court explained that "[s]ome of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (Cf. *People v. Hinshaw, supra,* 194 Cal. at p. 26 [the instruction states a recognized principle of law and is given in the abstract].) In addition, as noted in the preceding section, on these facts the jury could have rejected defendant's self-defense claim for one or more fact-based reasons. The record does not reflect the jury relied on this particular instruction for its rejection of defendant's self-defense claim. (See *People v. Olguin, supra*, 31 Cal.App.4th at p. 1382.)

Second, CALCRIM No. 3472, by itself, does not state or suggest anything about the intent to use nondeadly force to meet an adversary's sudden escalation to deadly force. CALCRIM No. 3471 would have addressed that issue, but the court

required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

"[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

19

declined to give it. As noted earlier, defendant does not claim on appeal the trial court's failure to give CALCRIM No. 3471 was error. We need not and will not speculate on whether it would or would not have been error in this case to give both instructions on these facts.

We recognize defendant's argument is based on the recent case of *People v. Ramirez, supra,* 233 Cal.App.4th 940. There, a majority of the Court of Appeal found that "CALCRIM No. 3472 under the facts before the jury did not accurately state governing law." (*Id.* at p. 947.) The majority reversed the defendants' convictions for first degree murder after finding that *giving* CALCRIM No. 3471, on which the defense relied, in combination with CALCRIM No. 3472, and the prosecutor's repeated misstatement of the law in closing arguments, "prevented the jury from considering their self-defense claims." (*People v. Ramirez,* at p. 940.)

Here, by contrast, the court did not give CALCRIM No. 3471, and the defense argument did not rely on the principle that if the defendant started the fight using nondeadly force and the opponent suddenly escalates to deadly force, the defendant may defend himself or herself using deadly force. (*People v. Quach* (2004) 116 Cal.App.4th 294, 301–302.)

Additionally, the prosecutor did not misstate the law in closing argument by referring to CALCRIM No. 3472. Even the *Ramirez* majority recognized that "CALRIM No. 3472 states a correct rule of law in appropriate circumstances." (*People v. Ramirez, supra*, 233 Cal.App.4th at p. 947.) The prosecutor correctly explained, "[CALCRIM No. 3472] means you can't make it up. You can't create a situation and provoke someone and get them to do something so they attack you so that you can just then do whatever the heck you want and say I was just defending myself." He articulated a factual theory for the application of the instruction to this case, arguing that the first fight gave defendant a pretext for

drawing Nicolas into the back parking lot so he could shoot him, and that defendant lied about Nicolas having a bat during the second confrontation so that he could justify shooting him. None of the prosecutor's comments misleadingly suggested that defendant forfeited his right to self-defense against Nicolas's use of deadly force because he provoked a fistfight, as the prosecutor's comments did in *Ramirez*. (*Ramirez*, at p. 947.)[8]

Finally, a trial court is obligated to instruct on the general principles of law relevant to the issues raised by the evidence. " ' "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, quoting from *People v. St. Martin* (1970) 1 Cal.3d 524, 531.) In this context, "raised by the evidence," means "substantial evidence"; that is, evidence from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78; *People v. Salas* (2006) 37 Cal.4th 967, 982–983.) In our view, there was substantial evidence to support the giving of CALCRIM No. 3472. In addition to evidence supporting the theory explicitly argued by the prosecutor, there was evidence of preexisting bad blood between defendant and Nicolas, as evidenced by the

---

[8] Defendant also claims the prosecutor misstated the law and lowered his burden of proof by telling the jury that if, for the sake of argument, the jury decided defendant "was justified in shooting that person with the gun; he was acting lawfully in self-defense; that would mean that you negate 245(b), Count I; so you'd find him not guilty if you find self-defense true. Then . . . you don't have to go to 12022.5; the personal use of the gun; and you also don't have to attack the gang statute." Because no objection was made below, we will not consider defendant's claim of prosecutorial misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) In any event, in light of the court's instructions and the overall tenor of both the defense and prosecution arguments, we can see no reasonable likelihood the jury took the prosecutor's foregoing comments to mean defendant had the burden of proving he acted in self-defense. (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

21

prior confrontations about which both Nicolas and Jorge testified. In addition, there was evidence that defendant was affiliated with a Norteño gang and Nicolas was a Sureño. The apartments in the 1300 block of Willow were within the Norteño gang's geographical boundaries. Nicolas resided in Jorge's apartment on that block. In combination, this evidence was sufficient to support the rational inference that defendant viewed Nicolas as an interloper and competitor on his turf, and that defendant sought a quarrel with Nicolas in order to set him up for the later, more serious confrontation in the alley. We see no trial court error.

Under these circumstances, there was no ineffective assistance of counsel, either. "A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Price* (1991) 1 Cal.4th 324, 440; *People v. Anderson* (2001) 25 Cal.4th 543, 569.) However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Price,* at p. 440.) Here, defendant cannot demonstrate prejudice, because there was no error in giving the instruction, and no basis for speculating that the court would not have given a correct instruction supported by the evidence if defense counsel had not asked for it. In any event, the evidence presented provided the jury with numerous other factual bases for rejecting defendant's self-defense claim. We therefore reject defendant's ineffective assistance of counsel claim.

## DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.